UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES S. QUILICI,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>JOSEPH L. DAVIS and RICHARD ANGLESEY,<br><br>　　　　　Defendants. | No. 2:16-cv-01523 MCE AC (PS)<br><br>FINDINGS AND RECOMMENDATIONS |

This matter is before the court on a motion for summary judgment by the two remaining defendants in this case, Officer Joseph L. Davis and Officer Richard Anglesey. ECF No. 25; see also ECF No. 10. Plaintiff is appearing in this action pro se. This matter was accordingly referred to the undersigned for pretrial proceedings by E.D. Cal. R. ("Local Rule") 302(c)(21). Defendants' motion was heard in open court, with all parties present, on April 25, 2018. ECF No. 34.

## I. BACKGROUND

Plaintiff filed his complaint on July 5, 2016. ECF No. 1. Because plaintiff was proceeding in forma pauperis, the complaint was screened pursuant to the IFP statute requiring federal courts to dismiss a case if the action is legally "frivolous or malicious," fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is

1

immune from such relief.  28 U.S.C. § 1915(e)(2),  ECF No. 3.  Plaintiff's initial complaint and first amended complaint were dismissed with leave to amend.  ECF No. 3 and 7.  Upon screening plaintiff's second amended complaint ("SAC"), ECF No. 8, the court determined that certain claims against certain defendants were sufficiently stated and ordered the SAC served as the operative complaint.  ECF No. 10.

The SAC alleges that CHP Officer Anglesey arrested plaintiff on March 27, 2014 for driving with a blood-alcohol level of 0.08 or greater.  SAC at 2 ¶ 8.  Plaintiff's license was suspended, and he was incarcerated for 18 hours in the Sacramento County Jail, charged with a felony.  Id. at 2-3 ¶¶ 8, 10.  Plaintiff alleges that this conduct amounted to a false arrest, and a search and seizure in violation of his Fourth Amendment rights.  Id. at 3 ¶ 12.  The SAC further alleges that on July 3, 2014, CHP Officers Anglesey and Davis arrested plaintiff for driving with a blood-alcohol level of 0.08 or greater.  Id. at 3 ¶ 9.  Plaintiff's license was suspended, and he was incarcerated for 16 hours in the Sacramento County Jail.  The SAC alleges that this conduct amounted to a search and seizure in violation of his Fourth Amendment rights.  Id. at 3 ¶ 13.  Plaintiff alleges that both arrests were "unwarranted."  Id. at 1 ¶ 1.  Plaintiff's car was seized for 30 days "in violation of due process."  Id. at 3-4 ¶ 14.  Plaintiff asserted in his SAC that the Department of Motor Vehicles ultimately concluded that the license suspensions, made pursuant to Cal. Veh. Code § 13353.2, were "unwarranted."  Id. at 5 ¶ 21.

The undersigned found at the screening stage that, although numerous defendants were named, the complaint stated potentially viable claims only against defendants Joseph L. Davis and Richard Anglesey.  ECF No. 10 at 6.  The undersigned determined that, for screening purposes, plaintiff successfully alleged three claims: (1) false arrest in violation of the Fourth Amendment; (2) unlawful search in violation of the Fourth Amendment; and (3) unlawful seizure in violation of the Fourth Amendment.  Id. at 4-5.  Defendants seek summary judgment on each of these claims.  ECF No. 25.

////

////

////

## II. STATEMENT OF UNDISPUTED FACTS

Unless otherwise specified, the following facts are either expressly undisputed by the parties or have been determined by the court, upon a full review of the record, to be undisputed by competent evidence. Defendants' statement of undisputed facts is located at ECF No. 25-2. Plaintiff's statement of undisputed facts is submitted in the form of his declaration at ECF No. 31-1.

### A. March 27, 2014 Arrest

On March 27, 2014, Officers Richard Anglesey and Joseph Davis were on patrol in a fully marked CHP patrol car in downtown Sacramento. Declaration of Richard Anglesey, ¶ 2, Ex. A; Declaration of Joseph Davis, ¶ 2, Ex. A. At approximately 2:10 a.m., Officers Anglesey and Davis were traveling northbound on 16th Street when they observed a vehicle driving with a broken headlight and darkly tinted front windows. Anglesey Decl. at ¶ 3, Ex. A; Davis Decl. at ¶ 3, Ex. A. Officer Anglesey accelerated and initiated an enforcement stop by activating the forward red emergency lights. Id. The vehicle yielded to the left and parked along the curb. Id. Officer Anglesey made contact with the driver through the driver's side window, and identified him as James Quilici. Id. Officer Anglesey observed that Mr. Quilici's face was pale and sweaty, he had red, watery eyes, dilated pupils, rapid, slurred speech, and was very agitated. Anglesey Decl. at ¶ 4, Ex. A; Davis Decl. at ¶ 4, Ex. A. Officer Anglesey also detected a slight odor of alcohol from his person. Id.

Officer Anglesey is trained as an IACP certified Drug Recognition Expert. Based upon his training, Officer Anglesey recognized Mr. Quilici's presentation and symptoms as indications that he was under the influence of alcohol or other substances. Anglesey Decl. at ¶ 7, Ex. A. Mr. Quilici testified in his deposition that he had taken prescription medications earlier that day. Mr. Quilici further testified that he had consumed multiple alcoholic beverages earlier that day. Deposition of James S. Quilici, 26:9, 46:3-7. Mr. Quilici testified at his deposition that he was agitated when he was stopped and questioned by Officer Anglesey, and that his speech is often rapid, mumbled, or slurred, a fact which he attributes to having been raised by deaf parents. Quilici Depo. at 41:25-43:4, 45:14-16.

Officer Anglesey then directed Mr. Quilici in a series of Field Sobriety Tests (FSTs). Anglesey Decl. at ¶ 9, Ex. A. It was Officer Anglesey's opinion, based on his observations, that Mr. Quilici failed to perform the FSTs properly. For example, on several occasions, Mr. Quilici lost his count during the tests and needed to start over. Id. Officer Anglesey administered a Horizontal Gaze Nystagmus (HGN) test, which is one of the three Standardized Field Sobriety Tests identified and validated by the National Highway Traffic Safety Administration for use in DUI investigations. Anglesey Decl. at ¶ 10, Ex. A. When performing a HGN test, which is approved by CHP policy, officers have the individual follow an object with their eyes while keeping their heads still to determine if their eyes are able to track the object in a smooth manner, or if they present with nystamgus. Id. If an individual has HGN, that is a sign or indicator that a person is possibly under the influence of alcohol and/or drugs. Id. During the Horizontal Gaze Nystagmus test, Mr. Quilici's eyes displayed nystagmus – a lack of smooth pursuit. Id.

The Romberg Balance Test is an alternative FST that officers may use in DUI investigations. Anglesey Decl. at ¶ 11, Ex. A. During a Romberg Balance Test, the individual is asked to stand with their feet together, tilt their head slightly back with their eyes closed and estimate when 30 seconds has passed. Id. During the test, Officer Anglesey is generally looking for the amount and direction of any swaying, body or eyelid tremors, the ability of the person to estimate the passage of time, their muscle tone, sounds or statements made during the test, and the ability to follow directions. Id. During the Romberg test, Officer Anglesey observed Mr. Quilici swaying. Officer Anglesey also observed Mr. Quilici's eyelids displaying rapid tremors throughout the test. Id. Mr. Quilici testified in his deposition that it was not comfortable to perform the tests that day because he was wearing dress shoes. Quilici Depo. at 40:22-41:3.

Based upon Mr. Quilici's objective signs of alcohol and drug intoxication and his poor performance of the Field Sobriety Tests, Officer Anglesey formed the opinion that Mr. Quilici had been driving while under the influence of alcohol or drugs and was unsafe to operate a motor vehicle. Anglesey Decl. at ¶ 13, Ex. A. Mr. Quilici was placed under arrest and transported to the CHP-Capitol Protection Section Office. Id. On March 27, 2014 at approximately 3:10 a.m., Officer Davis Performed a Drug Influence Evaluation at the CHP-Capitol Protection Section

Office. Davis Decl. at ¶ 5, Ex. A. Officer Davis is trained as an IACP certified Drug Recognition Expert. Id. Officer Davis observed that Mr. Quilici was agitated and annoyed when answering questions and asked to perform any tests. Officer Davis also observed that Mr. Quilici had difficulty maintaining attention. Id. at ¶ 6, Ex. A. During the Romberg test, Officer Davis observed Mr. Quilici swaying. Officer Davis also observed Mr. Quilici's eyelids displaying rapid tremors throughout the test. Id. at ¶ 7, Ex. A.

Based on Officer Davis' training and experience, and consistently with CHP's policies and procedures, a walk and turn test is also used to evaluate whether a person is exhibiting the signs and symptoms of being under the influence of drugs and/or alcohol. Davis Decl. at ¶ 8, Ex. A. During the walk and turn test, Officer Davis observed that Mr. Quilici lost his balance and had difficulty standing still while being instructed. Id. Mr. Quilici then led with the wrong foot, missed heel to toe on the first nine steps, and was required to use his arms to balance throughout the test. Id. Based on Officer Davis' training and experience, and consistently with CHP's policies and procedures, a one-leg stand test can be used to evaluate whether a person is exhibiting signs and symptoms of being under the influence of drugs and/or alcohol. During the one leg stand test, Officer Davis observed Mr. Quilici shaking and swaying in an attempt to maintain his balance. Id. at ¶ 9, Ex. A.

Based on Officer Davis' training and experience, and consistently with CHP's policies and procedures, a finger to nose test can be used to evaluate whether a person is exhibiting signs and symptoms of being under the influence of drugs and/or alcohol. Davis Decl. at ¶ 10, Ex. A. During the finger to nose test, Officer Davis observed Mr. Quilici touching the tip of his finger to his upper lip instead of his nose. Id. Officer Davis also had to remind Mr. Quilici to lower his arm after touching the tip of his nose. Id. During the examination, Officer Davis observed that Mr. Quilici's eyes displayed reddening conjunctiva, slow reaction to light, rebound dilation, and dilation in both room lighting and direct light. Id. at ¶ 11, Ex. A. Officer Davis also observed that Mr. Quilici's diastolic blood pressure and body temperature were low. Id. Officer Davis observed that Mr. Quilici's tongue was covered in a white, pasty film. Id. at ¶ 12, Ex. A. Based upon Officer Davis' Drug Influence Evaluation and his training as a Drug Recognition Expert,

Officer Davis formed the opinion that Mr. Quilici was under the influence of alcohol, central nervous system stimulants, and central nervous system depressants. Id. at ¶ 13, Ex. A.

Officer Anglesey completed a DMV Form DS 367 regarding the arrest and advised Mr. Quilici that he was required to contact the DMV to request a hearing to show that the suspension of his license was not justified. Anglesey Decl. at ¶ 14, Ex. A. Officer Anglesey circled the telephone number on the form by which Mr. Quilici could contact the DMV. Id. Neither Officer Anglesey, Officer Davis, or any other employee of the CHP suspended or revoked Mr. Quilici's driver's license. Anglesey Decl. at ¶ 15; Davis Decl. at ¶ 14. CHP does not have the authority to suspend a driver's license, as that authority is vested in the DMV. Id. Neither Officer Anglesey nor Officer Davis searched Mr. Quilici's vehicle (i.e., performed an investigatory search), but a standard vehicle inventory was performed to prevent against theft when the vehicle was towed. Anglesey Decl. at ¶ 16; Davis Decl. at ¶ 15.

Toxicology tests from the March 27, 2014 arrest shows a blood alcohol level of 0.010. ECF No. 30-1 at ¶ 14. The toxicology report was not available until July 17, 2014. Id.

B.   July 3, 2014 Arrest

On July 3, 2014, Officers Richard Anglesey and Joseph Davis were on patrol in a fully marked CHP patrol car in downtown Sacramento. Anglesey Decl. at ¶ 18, Ex. B; Davis Decl. at ¶ 17, Ex. B. At approximately 3:50 a.m., Officers Anglesey and Davis were traveling eastbound on J Street when they observed a vehicle driving slowly despite light traffic, weaving in a serpentine manner in and out of its lane, and nearly colliding with a parked car. Anglesey Decl. at ¶ 19, Ex. B; Davis Decl. at ¶ 18, Ex. B. Officer Anglesey accelerated and initiated an enforcement stop by activating the forward red emergency lights. Id. The vehicle yielded to the left and parked along the curb. Id.

Officer Anglesey contacted the driver through the driver's side window. Anglesey Decl. at ¶ 20, Ex. B; Davis Decl. at ¶ 19, Ex. B. Officer Anglesey contacted the driver through the driver's side window. Id. The driver was identified as James Quilici. Id. A driver's license check indicated that Mr. Quilici's license was suspended by the DMV effective May 15, 2014 for excessive blood alcohol. Id. Officer Anglesey observed that Mr. Quilici's eyelids were retracted,

he was nervous and fidgety, and was sweating despite the cool temperature. The driver was identified as James Quilici. Id. Based upon his training, Officer Anglesey recognized Mr. Quilici's presentation and symptoms as indications that he was under the influence of alcohol or other substances. Anglesey Decl. at ¶ 21, Ex. B.

Officer Anglesey directed Mr. Quilici in a series of Field Sobriety Tests which Mr. Quilici failed to perform properly. Anglesey Decl. at ¶ 22, Ex. B. Officer Anglesey observed that Mr. Quilici displayed an inability to follow directions during the tests. Id. Officer Anglesey was required to remind Mr. Quilici to stand with his heels and toes together and arms down at his sides on several occasions. Id. During the Horizontal Gaze Nystagmus test, Mr. Quilici's eyes displayed a lack of smooth pursuit. Id. at ¶ 23, Ex. B. During the Romberg test, Officer Anglesey observed Mr. Quilici swaying. Id. at ¶ 24, Ex. B. Officer Anglesey also observed Mr. Quilici's eyelids displaying rapid tremors throughout the test. Id. During the one leg stand test, Officer Anglesey observed that Mr. Quilici displayed an inability to follow directions. Id. at ¶ 25, Ex. B. Officer Anglesey was required to stop the test and repeat the directions. Id. Officer Anglesey also observed Mr. Quilici swaying in an attempt to maintain his balance. Id.

Based upon Mr. Quilici's objective signs of alcohol and drug intoxication and his poor performance of the Field Sobriety Tests, Officer Anglesey formed the opinion that Mr. Quilici had been driving while under the influence of alcohol or drugs and was unsafe to operate a motor vehicle. Anglesey Decl. at ¶ 26, Ex. B. Mr. Quilici was placed under arrest and transported to the CHP-Capitol Protection Section Office. Id. On July 3, 2014 at approximately 4:40 a.m., Officer Davis Performed a Drug Influence Evaluation at the CHP-Capitol Protection Section Office. Davis Decl. at ¶ 20, Ex. B.

Officer Davis observed that Mr. Quilici was agitated and fidgety, sweating with a red flushed face, and displaying bruxism. Id. at ¶ 21, Ex. B. Officer Davis also observed that Mr. Quilici's eyelids were retracted, his face was rigid, his speech was deliberate, and he had red, watery eyes. Id. Officer Davis also observed that Mr. Quilici had difficulty maintaining attention as Officer Davis explained and demonstrated each test. Id. During the Romberg test, Officer Davis observed that Mr. Quilici's mouth was partially open and rigid as he displayed bruxism

7

throughout the test. Id. at ¶ 22, Ex. B. Officer Davis also observed Mr. Quilici swaying during the test. Id. Officer Davis also observed Mr. Quilici's eyelids displaying rapid tremors throughout the test. Id. During the walk and turn test, Officer Davis observed that Mr. Quilici failed to look at his feet as instructed, and that Mr. Quilici made slow and methodical movements for each step, while raising his arms to maintain his balance. Id. at ¶ 23, Ex. B. During the one leg stand test, Officer Davis observed Mr. Quilici shaking and swaying in an attempt to maintain his balance. Officer Davis also observed Mr. Quilici losing count during the test. Id. at ¶ 24, Ex. B. During the finger to nose test, Officer Davis observed Mr. Quilici failing to touch the tips of his finger to the tips of his nose throughout the test. Id. at ¶ 25, Ex. B.

Officer Davis also performed a examination in which he observed that Mr. Quilici's eyes were red and watery, that he displayed horizontal gaze nystagmus, that his pupils were slow to react to light and displayed rebound dilation, and that his pupils were dilated in direct light conditions. Id. at ¶ 26, Ex. B. Officer Davis also observed that Mr. Quilici's systolic blood pressure and body temperature were low, and that his muscle tone was rigid. Id. Officer Davis observed that Mr. Quilici's tongue was covered in a white, pasty film. Id. at ¶ 27, Ex. B. Based upon Officer Davis' drug influence evaluation and his training as a Drug Recognition Expert, Officer Davis formed the opinion that Mr. Quilici was under the influence of central nervous system stimulants, central nervous system depressants, narcotic analgesics, and cannabis. Id. at ¶ 28, Ex. B.

Officer Anglesey completed a DMV Form DS 367 regarding the arrest. Anglesey Decl. ¶ 27, Ex. B. Officer Anglesey advised Mr. Quilici that he was required to contact the DMV to request a hearing to show that the suspension of his license was not justified. Id. Declaration of Id. Neither Officer Anglesey, Officer Davis, or any other employee of the CHP suspended or revoked Mr. Quilici's driver's license. Anglesey Decl. at ¶ 28; Davis Decl. at ¶ 29. CHP does not have the authority to suspend a driver's license, as that authority is vested with the DMV. Id. Mr. Quilici attempted to contact the DMV at the number indicated to request a hearing but without results due to the "wait on hold" time. ECF No. 30-1 at ¶ 6. Mr. Quilici would wait on hold for 20 minutes and then be disconnected. Id.

8

Neither Officer Anglesey nor Officer Davis searched Mr. Quilici's vehicle (i.e., performed an investigatory search), but a standard vehicle inventory was performed to prevent against theft when the vehicle was towed. Anglesey Decl. at ¶ 29; Davis Decl. at ¶ 30.

Because Mr. Quilici was determined to be driving a vehicle while his driving privilege was suspended, Mr. Quilici's vehicle was impounded pursuant to Vehicle Code § 14602.6(a)(1). Anglesey Decl. at ¶ 30; Davis Decl. at ¶ 31, ECF No. 30-1 at ¶ 12. On both occasions, pursuant to CHP's policies, a standard inventory was taken of Mr. Quilici's vehicle. CHP's policy provides that officers shall prepare a list of all property contained in legally accessible areas of the vehicle's passenger compartment, including the glove compartment, center console, and trunk of the vehicle. Anglesey Decl. at ¶ 32; Davis Decl. at ¶ 33. As outlined in the policy, "[a] vehicle inventory is intended to protect an owner's property and protect the [CHP] against claims of lost, stolen, or vandalized property." Id.

The toxicology report from the July 3, 2014 arrest revealed a 0.00 blood alcohol level. ECF No. 30-1 at ¶ 14. The toxicology report was not complete until September 24, 2014. Id.

### III. ANALYSIS

A. <u>Standard on Summary Judgment</u>

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact." In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

"Where the non-moving party bears the burden of proof at trial, the moving party need

only prove that there is an absence of evidence to support the non-moving party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. In such a circumstance, summary judgment should "be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n., 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," Anderson, 447 U.S. at 248. In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "'the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" T.W. Elec. Serv., 809 F.2d at 630 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)). Thus, the "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita, 475 U.S. at 587 (citation and internal quotation marks omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact, [the court] draw[s] all inferences supported by the evidence in favor of the non-moving party." Walls v. Cent. Costa Cnty. Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011) (citation omitted). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586 (citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. at 587 (quoting First Nat'l Bank, 391 U.S. at 289).

      B.     Qualified Immunity Standard

Defendants assert that they are entitled to summary judgment on grounds of qualified immunity. ECF No. 25-1 at 19. Government officials are immune "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). Ideally, qualified immunity is determined at the earliest possible stage in litigation to avoid unnecessary burden and expense. Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam).

In Saucier v. Katz, the Supreme Court set forth a two-step inquiry for determining whether qualified immunity applies. 533 U.S. 194, 201 (2001). First, a court must ask, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. Second, if the answer to the first inquiry is "yes," the court must ask whether the constitutional right was "clearly established." Id. This second inquiry is to be undertaken in the specific context of the case. Id. In Pearson v. Callahan, the Supreme Court removed any requirement that the Saucier test be applied in a rigid order, holding

"[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. at 236.

"The plaintiff bears the burden of proof that the right allegedly violated was clearly established." Tarabochia v. Adkins, 766 F.3d 1115, 1125 (9th Cir. 2014) (internal quotation marks omitted). "To meet this standard the very action in question need not have previously been held unlawful." Id. (internal quotation marks omitted). This is especially the case in the context of alleged Fourth Amendment violations, where the constitutional standard of "reasonableness" requires a fact-specific inquiry. Mattos v. Agarano, 661 F.3d 433, 442 (9th Cir. 2011) (en banc). The court must determine "whether a reasonable officer would have had fair notice that the action was unlawful[.]" Tarabochia, 766 F.3d at 1125 (internal quotation marks and brackets omitted). At its base, "[t]he qualified immunity doctrine rests on a balance between, on the one hand, society's interest in promoting public officials' observance of citizens' constitutional rights and, on the other, society's interest in assuring that public officials carry out their duties and thereby advance the public good." Beier v. City of Lewiston, 354 F.3d 1058, 1071 (9th Cir. 2004).

### C. False Arrest in Violation of the Fourth Amendment

Plaintiff claims that his arrests on two separate occasions, by the defendant officers, were "unwarranted" and that the charges against him were ultimately dismissed. The Fourth Amendment to the U.S. Constitution protects individuals, in relevant part, from unlawful arrest. U.S. Const. amend. IV. It is well established that "an arrest without probable cause violates the Fourth Amendment and gives rise to a claim for damages under § 1983." Borunda v. Richmond, 885 F.2d 1384, 1391 (9th Cir. 1988). Even an officer who makes an arrest without probable cause, however, may be entitled to qualified immunity if he reasonably believed there to have been probable cause. See Ramirez v. City of Buena Park, 560 F.3d 1012, 1024 (9th Cir. 2009).

When analyzing a claim of unlawful arrest to see if qualified immunity applies, a court applies a two pronged test: "(1) whether there was probable cause for the arrest; and (2) whether it is reasonably arguable that there was probable cause for arrest – that is, whether reasonable

12

officers could disagree as to the legality of the arrest such that the arresting officer is entitled to qualified immunity." Rosenbaum v. Washoe County, 663 F.3d 1071, 1076 (9th Cir. 2011). Probable cause for a warrantless arrest exists when "the facts and circumstances within [an officer's] knowledge are sufficient for a reasonably prudent person to believe that the suspect has committed a crime." Id. The inquiry on the second factor is two-fold: first, a court must determine "historical facts," that is, the events leading up to the stop or search; second, the court must determine "whether those historical facts, viewed from the standpoint of the reasonable police officer," amount to probable cause. Ornelas v. United States, 517 U.S. 690, 696 (1996). Importantly, "[t]he validity of the arrest does not depend on whether the suspect actually committed the crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest" – that is, "the kinds and degree of proof and the procedural requirements necessary for a conviction are not prerequisites to a valid arrest." Michigan v. DeFillippo, 443 U.S. 31, 36 (1979) (citing Gerstein v. Pugh, 420 U.S. 103, 119-23 (1975)). Rather, "[b]ecause the probable cause standard is objective, probable cause supports an arrest so long as the arresting officers ha[ve] probable cause to arrest the suspect for any criminal offense, regardless of their stated reason for the arrest." Edgerly v. City and County of San Francisco, 599 F.3d 946, 954 (9th Cir. 2010) (citing Devenpeck v. Alford, 543 U.S. 146, 153-55 (2004)).

Here, it is clear that the defendant officers had probable cause to arrest plaintiff; even if they did not, they are entitled to qualified immunity. With respect to plaintiff's first arrest on March 27, 2014, plaintiff admits that "it is undisputed the defendant had probable cause to pull over plaintiff for tinted windows and the driver side headlight out." ECF No. 30-1 at ¶ 1. The objective circumstances observed by the officer on July 3, 2014, also fully supported an investigatory traffic stop. After executing the stops on both occasions, the officers observed numerous objective indicia of intoxication or impairment, discussed in detail above, that established probable cause for plaintiff's arrest. See, Davis Decl., Ex. A and B; Anglesy Decl., Ex. A and B.

Plaintiff makes no meaningful challenge to the officers' observations. ECF No. 30-1.

13

Although plaintiff testified that he did not feel he had trouble remembering instructions on the field tests (Quilici Deposition at 44, ¶¶ 7-20), he did not offer any testimony disputing his objective performance on the field tests. Plaintiff challenges the officers' reports that he refused to take a preliminary alcohol-screen, by arguing that the March 27, 2014 police report states that the arresting officer stated plaintiff requested a breathalyzer test. ECF No. 30 at 5. However, a review of the police report shows that the preliminary test was refused. Anglesey Decl. Ex. A (ECF No. 25-4 at 9).

Plaintiff's arguments regarding the ultimate outcome of his toxicology reports, which showed a blood alcohol level well below the legal limit, are likewise unavailing. ECF No. 30-1 at ¶ 14. Whether or not plaintiff was ultimately found to have been driving with an elevated blood alcohol level, the undisputed facts of the officers' observations and the results of the field sobriety tests demonstrate that no reasonable jury could find that the officer defendants lacked probable cause to arrest plaintiff on March 27, 2014 or July 3, 2014. Defendants are entitled to summary judgment on this cause of action.

### D. Unlawful Seizure in Violation of the Fourth Amendment

Plaintiff claims that his car was unlawfully impounded. The impoundment of plaintiff's car "is a seizure within the meaning of the Fourth Amendment." Miranda v. City of Cornelius, 429 F.3d 858, 862 (9th Cir. 2005) ("[t]he Fourth Amendment protects against unreasonable interferences in property interests regardless of whether there is an invasion of privacy"). Accordingly, it must be reasonable. Id. at 862 ("[t]he Fourth Amendment protects against unreasonable interferences in property interests"). The SAC alleges that the CHP officers seized plaintiff's car because he was driving on a suspended license. See Cal. Veh. Code § 14602.6(a)(1) (authorizing seizure of vehicle when driven on a suspended license). However, plaintiff alleges that his license had been "falsely suspended." SAC at ¶¶ 12-14.

"A seizure conducted without a warrant is per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well delineated exceptions. The burden is on the Government to persuade the district court that a seizure comes under one of a few specifically established exceptions to the warrant requirement." United States v. Hawkins,

249 F.3d 867, 872 (9th Cir. 2001) (internal quotation marks and citations omitted). One such "established exception" is the "community caretaking doctrine," which allows officers to impound vehicles that "jeopardize public safety and the efficient movement of vehicular traffic." South Dakota v. Opperman, 428 U.S. 364, 369 (1976). "Whether an impoundment is warranted under this community caretaking doctrine depends on the location of the vehicle and the police officers' duty to prevent it from creating a hazard to other drivers or being a target for vandalism or theft." Miranda, 429 F.3d at 864 (internal citations omitted). "A driver's arrest, or citation for a non-criminal traffic violation as in this case, is not relevant except insofar as it affects the driver's ability to remove the vehicle from a location at which it jeopardizes the public safety or is at risk of loss." Id.

The facts of this case demonstrate that the seizure of plaintiff's vehicle was within the bounds of the Fourth Amendment. As discussed above, on July 3, 2014, the occasion on which plaintiff's vehicle was impounded, defendant officers seized the vehicle under California Vehicle Code section 14602.6(a)(1), which authorizes impounding a vehicle when the driver has a suspended license. Anglesey Decl. at ¶ 30; Davis Decl. at ¶ 31, ECF No. 30-1 at ¶ 12. The exigent circumstances of plaintiff's arrest, his associated inability to remove his vehicle from the road, and the fact of plaintiff's suspended license, collectively justified impoundment.

Plaintiff argues that the Ninth Circuit's recent holding in Brewster v. Beck, 859 F.3d 1194, 1195 (9th Cir. 2017), invalidated California Vehicle Code § 14602.6(a)(1). ECF No. 30 at 2. Plaintiff misreads Brewster. In that case, Lamya Brewster loaned her vehicle to her brother-in-law, and the vehicle was impounded pursuant to § 14602(a)(1) when he was stopped by the Los Angeles Police Department ("LAPD") and was discovered to be driving on a suspended license. Id. at 1195. Three days later, Brewster appeared at a hearing with proof that she was the registered owner of the vehicle, her valid driver's license, and an offer to pay all towing and storage expenses. The LAPD refused to release the vehicle until the 30 day holding period had lapsed. Id. In Brewster, the parties agreed "that the LAPD could impound — and, therefore, seize — Brewster's vehicle under section 14602.6(a)(1) pursuant to the community caretaking exception to the Fourth Amendment." Id. at 1196. The Ninth Circuit found, however, that the

15

exigency that justified the initial impoundment expired when Brewster provided proof of her vehicle ownership, and that the 30-day impound of Brewster's vehicle constituted a distinct seizure that required compliance with the Fourth Amendment. Id. at 1197.

The holding in Brewster supports the conclusion that Mr. Quilici's vehicle was lawfully impounded pursuant to the community caretaking doctrine. Upon his arrest for suspected intoxicated driving, Mr. Quilici was unable to remove his vehicle from the road. Mr. Quilici has presented no evidence that he attempted to remove his vehicle from impoundment before the expiry of the 30 day impoundment period or that any such attempt was refused. Instead, Mr. Quilici challenges the initial impoundment which, as in Brewster, was proper under the community caretaking doctrine.

Plaintiff further contends that the impoundment of his vehicle was improper because it followed from an unlawful suspension of his driver's license, for which he holds defendants responsible. SAC at 8, ECF No. 30 at 3. At hearing on the motion, plaintiff repeatedly asserted that the defendants did not follow policy when, after plaintiff's first arrest, they sent paperwork to the Department of Motor Vehicles which resulted in the suspension of his license. This argument fails for several reasons. First, it is undisputed that defendants do not have the authority to suspend Mr. Quilici's driver's license; that authority rests exclusively with the Department of Motor Vehicles. Anglesey Decl. at ¶ 15; Davis Decl. at ¶ 14. There is no defendant from the Department of Motor Vehicles in this case. Second, California law requires peace officers to report DUI arrests to the DMV, which immediately suspends driving privileges subject to administrative review. See Cal. Veh. Code §§ 13353.2, 13380, 13388. Third, even if the defendants violated policy in some way and erred in submitting the post-arrest paperwork to the Department of Motor Vehicles, plaintiff has not identified any source of law clearly establishing that such an error would have violated his constitutional rights. The defendants are therefore entitled to qualified immunity.

Plaintiff does not dispute that on the occasion of his July 3, 2014 arrest, defendants properly determined that his license was, in fact, suspended. Accordingly, no Fourth Amendment violation took place when plaintiff's vehicle was impounded, and the officer defendants are

16

entitled to summary judgment on this cause of action.

### E. Unlawful Search in Violation of the Fourth Amendment

Plaintiff claims that both he and his car were searched on both occasions of his arrest, in violation of his Fourth Amendment rights. SAC at ¶¶ 12, 13. Defendant officers have testified that neither of them searched Mr. Quilici's vehicle (i.e., no investigatory search was conducted), but that a standard vehicle inventory was performed to prevent against theft when the vehicle was towed. Anglesey Decl. at ¶ 16; Davis Decl. at ¶ 15.

"Once a vehicle has been legally impounded, the police may conduct an inventory search without a warrant." United States v. Torres, 828 F.3d 1113, 1120 (9th Cir. 2016). Like the decision to impound, the scope of the inventory search must conform to the standard procedures of the local police department. Id. Generally, standard inventory searches that follow standard police procedures are not "unreasonable" under the Fourth Amendment. Opperman, 428 U.S. at 376. Here, plaintiff makes no particular allegations and presents no evidence regarding the propriety of defendants' inventory search. Because defendants' evidence on this point is undisputed, plaintiff cannot establish that a Fourth Amendment violation occurred and summary judgment must be entered in favor of defendants.

### III. PROCEDURAL DUE PROCESS CLAIM

As noted above in discussion of the impoundment-related claim, plaintiff's greatest concern appears to be with the ordeal he experienced in having his license suspended. At hearing on defendants' motion for summary judgment, plaintiff emphasized the difficulties he experienced in dealing with the DMV and getting his driving privileges reinstated. Because those problems were not proximately caused by the defendant CHP officers, however, they cannot support liability. See Arnold v. International Business Machines, 637 F.2d 1350 (9th Cir. 1981) (causation requirement under § 1983 requires proximate or legal cause).

Moreover, as previously explained, the SAC failed to identify any proper defendant for a due process challenge to the license suspension. ECF No. 10 at 5-6. Although the court did not purport to dismiss plaintiff's putative procedural due process claim, it explained that the unnamed DMV employee defendants could not be served. Id. Plaintiff never sought to amend his

complaint in order to name the Doe defendants, and the time for doing so has long since expired.

Because no defendant has ever been served, plaintiff's due procss claim against unnamed DMV employees must be dismissed on the court's own motion. Fed. R. Civ P. 4(m).

The undersigned notes in this regard that any attempt to amend this claim, or to proceed on it, would have failed. As a state agency, the DMV The court previously construed plaintiff's due process claim as alleging that he was denied a hearing following the impoundment of his car. ECF No. 10 at 5. In his opposition to summary judgment, however, plaintiff acknowleged that he was provided the paperwork to request a hearing, and attempted to contact the DMV at the number provided, but was foiled by the "wait on hold" time. ECF No. 30-1 at ¶ 6. Plaintiff declared that he would wait on hold for 20 minutes and then be disconnected. Id. The fact that plaintiff then abandoned his pursuit of a hearing demonstrates that he was not *deprived* of a hearing. It is well-established in the context of driver's license suspensions that an opporunity for post-deprivation hearing, which California provides, is enough to satisfy the constitutional guarantee of due proess. See generally Banks v. Dep't of Motor Vehicles for Cal., 419 F.Supp.2d 1186, 1195 (C.D. Cal. 2006); People v. Bailey, 133 Cal.App.3d Supp. 12 (1982).

For all these reasons, plaintiff's due process claim against unserved defendants should be dismissed.

### III. CONCLUSION

In light of the foregoing, it is hereby RECOMMENDED as follows:

1. Defendants' motion for summary judgment (ECF No. 25) should be GRANTED, and judgment be entered in favor of the moving defendants;
2. Plaintiff's due process claim against unserved defendants should be DISMISSED; and
3. This case should be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty one days after being served with these findings and recommendations, plaintiff may file written objections with the court and serve a copy on all parties. Id.; see also Local Rule 304(b). Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure

to file objections within the specified time may waive the right to appeal the District Court's order.  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

DATED: May 1, 2018

/s/ Allison Claire
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE